IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SERGIO RENTERIA and<br>SANDRA RENTERIA,<br>*husband and wife,*<br><br>          Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | CV 05-00532-TUC-CKJ [CRP]<br><br>REPORT AND RECOMMENDATION |

Plaintiffs Sergio and Sandra Renteria (hereafter "Renterias") allege that the Farm Services Agency (hereafter "FSA") negligently processed their loan application, and they were harmed as a result. Defendant, United States of America, (hereafter "Defendant") moves to dismiss the complaint for lack of subject matter jurisdiction. The Renterias oppose the motion. For reasons that follow, the Court recommends that the District Judge, after her independent review, GRANT the Motion To Dismiss [Dkt 9]in part and DENY in part.

While there are several parts to Defendant's motion, the determinative issue is whether the Renterias' Complaint states a cause of action for tort under Arizona law. The Renterias assert that the Good Samaritan Doctrine imposed a duty on FSA to use reasonable care in processing the loan. Defendant alleges that the Doctrine is inapplicable.

**I.   FACTS**

While the facts of this case are convoluted, they can be divided into three crop years: 2000, 2001 and 2002. In 1999, the Renterias investigated a farming operation in Willcox,

Arizona. Complaint, ¶8. In 2000, after being turned down for FSA guaranteed loans from private banks[1], the Renterias applied for acquisition and operating loans from FSA. (*Id.* ¶17) The critical facts alleged are:

> Although Mr. Renteria had applied for his loans in September of 1999, his loans were not approved until September 2000, causing him to lose an entire year of production and its associated income. Mr. Renteria was told the first application had expired. Mr. Renteria replaced it. He then was told the replacement application was lost. Plaintiffs had to create a third set of new loan applications. The third set of applications was denied by the County FSA Committee upon improper staff advice.

*Id.* ¶18.

The Complaint also states that FSA employees gave the Renterias incorrect directives or no advice at all. Complaint, ¶¶ 19, 20, 21. Despite this, the Renterias were ultimately able to obtain the loan, apparently in September 2000. However, they lost out on "an entire operating cycle and a year's potential income." Complaint, ¶21.

For crop year 2001, the Renterias assert that FSA's failure to timely distribute loan proceeds required the chili crop to be manually weeded, instead of chemically through an herbicide. *Id.* ¶22. Critical to the failure to timely distribute loan proceeds was FSA employee David Toll's failure to "timely process the change in plans for a chili crop." *Id.*, ¶29. Apparently, the same day of the dispute regarding the change in crop approval, a heavy rainfall occurred making the herbicide option moot. *Id.* ¶¶ 27, 28, 29. It cost the Renterias $60,000 to manually weed the chili crop. *Id.* ¶30.

Ultimately, the crop failed, not because of the weeds, but because of herbicide residue that pre-existed the Renterias' purchase of the land. *Id.* ¶¶ 31, 32. Regarding the 2001 crop, the Renterias allege:

> FSA's David Toll knew about the herbicide residue in the ground. Mr. Toll made material representations to Plaintiffs by telling them that he thought there was a history of "chili disease" on the property. Plaintiffs checked and discovered that there

---

[1] The Renterias complained that misrepresentations by FSA employees caused the loan denials. Those misrepresentations are not actionable under the Fair Tort Claim Act. 28 U.S.C. § 2680(h).

- 2 -

> was no such history. If Mr. Toll had revealed the true basis for his suggestion not to plant chilies, Plaintiffs would not have done so. A truthful disclosure would also have saved Plaintiffs the wasted investment in a crop that had to be abandoned.

*Id.* ¶34.

The chili crop was declared a failure on July 19, 2001, after which the Renterias notified FSA they would need loan servicing or emergency loans. As these were not forthcoming, the Renterias filed for bankruptcy. *Id.* ¶35.

As a result of these problems, the Renterias were unable to get operating loans from FSA or other lenders for the following crop year, 2002. *Id.* ¶38. The Renterias claim $1,525,157.00 in lost profits for that year. *Id.* ¶39.

In the fall of 2002, the Renterias were unable to plant alfalfa on a leased farm because of the bankruptcy court order allowing the release of the FSA funds (AMTA payments). *Id.* ¶40-46. Payment was not received until December, which was far too late to plant alfalfa.

The Renterias concede that if Defendant did not have a duty under Arizona law based on the Good Samaritan Doctrine, they lose their lawsuit. They also assert that FSA was negligent in two respects:

1) FSA processed the loan in a negligent fashion; and

2) FSA approved the loan to plant certain crops knowing that the crop would fail.

Defendant asserts that the Good Samaritan Doctrine in Arizona only applies to inspection services related to public safety and to government activities with no private analogue. Defendant also argues that the Renterias are in effect complaining about misrepresentations by Mr. Toll and others; such complaints are not actionable under Federal Torts Claim Act. 28 U.S.C. § 2680(h).

**II.   LAW**

The question of whether there is a legal duty to act or refrain from acting is a threshold issue in any lawsuit, one that is appropriately raised by a motion to dismiss authorized under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (hereafter "Rules").

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject

1 matter jurisdiction, or the existence of subject matter jurisdiction in fact. *Thornhill Publ'g Co., Inc. v. General Tel. & Elecs. Corp.,* 594 F.2d 730, 733 (9th Cir.1979). When the motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996). When the motion to dismiss is a factual attack on subject matter jurisdiction, however, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction in fact. *Thornhill,* 594 F.2d at 733.

A plaintiff has the burden of proving that jurisdiction does in fact exist. *Thornhill,* 594 F.2d at 733. Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Rosenbaum v. Syntex Corp.,* 95 F.3d 922, 926 (9th Cir.1996).

A motion to dismiss under Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  In these instances, review is limited to the contents of the complaint. *Campanelli v. Bockrath,* 100 F.3d 1476, 1479 (9th Cir.1996).  Such a motion may also be granted if an affirmative defense or other bar to relief is apparent from the face of the complaint, such as absolute immunity or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* ¶ 12.07 at 12-68 to 12-69 (2d ed. 1991 & Supp. 1191-92) citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

Under the Federal Tort Claims Act (hereafter "FTCA"), subject to certain statutory exceptions and limitations, the United States is liable in tort "in the same manner and to the same extent as a private individual in like circumstances."  28 U.S.C. § 2674.  Exclusive subject matter jurisdiction is accorded to the federal district courts for civil actions for money damages:

> ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

1         occurred.

2 28 U.S.C. § 1346(b).

3     Defendant asserts that the Good Samaritan Doctrine only applies to physical safety cases. Citing *Love v. United States*, 915 F.2d 1242 (9th Cir. 1990). In *Love*, the court acknowledged that Montana recognized the Good Samaritan Doctrine and observed it is "typically" applied to inspection services related to physical safety. *Love*, 915 F.2d at 1248. In *Love*, economic harm resulted from the foreclosure on a Farmers Home Administration loan.. The Court of Appeals upheld the dismissal of the Good Samaritan claim because "(p)hysical safety was not implicated". *Id.*

10     The FTCA explicitly recognizes that there is no uniform circuit law on torts, but rather the law of the state where the action arose controls. 28 U.S.C. § 1346(b), § 2674. In many states, courts apply the Good Samaritan Doctrine only to physical harms to person or property, not to pure economic harm. *Shaner v. United States*, 976 F.2d 990, 994 (6th Cir. 1992) (Ohio Law); *St. Denis v. Department of Housing and Urban Development*, 900 F.Supp. 1194, 1203-04, (D. Alaska 1995) (Alaska law); *Audio Odyssey Ltd. v. United States*, 243 F.Supp. 2d 951, 965 (S.D. Iowa 2003) (Iowa law). Arizona courts hold otherwise, "[t]he volunteer may be liable for economic harm as well as physical harm." *Lloyd v. State Farm Mutual Insurance Co.*, 176 Ariz. 247, 250, 860 P.2d 1300, 1303 (App. 1992). In this case, the fact that a safety inspection is not at issue, does not preclude recovery.

20     Defendant also argues that the Good Samaritan Doctrine only applies to hold a government entity liable in situations where the activity in issue has no private sector analogue; the present action then, is precluded because the private sector provides commercial loans to farmers. The sole authority cited for this position is Judge Kozinski's *dissent* to the certification of a question to the Arizona Supreme Court in *Carroll v. United States*, 923 F.2d 752 (9th Cir. 1991). In *Carroll*, Judge Kozinski noted that the Good Samaritan Doctrine "normally" is only applied by the federal government for activities that have no private sector analogue. *Id.* at 753. Obviously, a dissenting opinion has no precedential value. Moreover, the notion that liability only incurs where there is no private

- 5 -

1 sector analogue is contrary to the explicit directive of the FTCA that liability attaches in
2 instances where a private person would be liable. 28 U.S.C. § 1346(b). Additionally, the
3 Supreme Court specifically instructed the federal courts to look for a private person analogy
4 in a federal mine safety inspection case. *United States v. Olson*, ____ U.S. ____, 126 S.Ct.
5 510, 513 (2005). Defendant's argument that because a private analogue (commercial
6 banking) exists, the claim fails, is unavailing.

7 The question remains whether Arizona law applies the Good Samaritan Doctrine to
8 the facts of this case. In essence, the question which was certified to the Arizona Supreme
9 Court in *Carroll*, and to date remains unanswered, needs to be resolved in this case.

10 The Good Samaritan Doctrine, states:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for
> the protection of the other's person or things, is subject to
> liability to the other for physical harm resulting from his failure
> to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such
>     harm, or
> (b) the harm is suffered because of the other's reliance upon the
>     undertaking.

Restatement of Torts, Second, § 323.

17 The Court must apply this doctrine to two separate circumstances in this case: the
18 processing of the Renterias' loan application; and the distribution of funds for their approved
19 loan. The complaint, as drafted, necessitates that the Court analyze the Renterias' claims by
20 crop year.

21 **1. CROP YEAR 2000**

22 The Renterias applied for acquisition and operating loans from FSA in September
23 1999, but the loans were not approved until September 2000. *Id.* ¶18. As a result, the
24 Renterias missed the entire 2000 crop year and lost a full year's potential income. *Id.* ¶21.
25 The Renterias allege that FSA was negligent in processing the loan application. *Id.* ¶¶ 19,
26 20, 21.

27 While the Renterias concede that initially FSA had no duty to accept their loan
28 applications, they argue that once FSA accepted their application, it had the obligation to use

1  reasonable care in processing their loan.  As support, the Renterias cite Restatement of Torts.

2  While § 323 does establish a duty on those who gratuitously render service to another,
3  the harm that is suffered must be "because of the other's reliance upon the undertaking."
4  Restatement (Second) of Torts, § 323(b).  In *Florida Auto Auction of Orlando, Inc. v. United*
5  *States*, 74 F.3d 498 (4th Cir. 1996), auto auction companies sued the Federal Government on
6  theories of negligence and conversion because customs officials allowed automobiles to be
7  exported without presentment of a certificate of title as required by federal regulation.  The
8  court found no evidence that the auto auction companies relied on customs officials to
9  enforce the certificate of title requirement to protect their interest.  *Florida Auto Auction of*
10 *Orlando, Inc.*, 74 F.3d at 505.  Thus, the negligence claim based on the Good Samaritan
11 Doctrine failed.  See also, *Moody v. United States*, 774 F.2d 150, 156-57 (6th Cir. 1985)
12 (Farmers Home Administration housing loan inspection regulations explicitly enacted to
13 protect the government thus, precluding the borrowers reliance thereon.).

14 This need for reliance is emphasized not only in the explicit language of § 323, but
15 also in the comments to the Restatement:

16 > The Institute expresses no opinion as to whether: (1) the making
> of a contract, or a gratuitous promise, without in any way
17 > entering upon performance, is a sufficient undertaking to result
> in liability under the rule stated in this section.
18

19 See also, §323, comment d.

20 In September 1999, the Renterias applied for acquisition and operating expense loans.
21 No doubt they expected the loan applications to be approved promptly.  The Renterias,
22 however, were not legally entitled to rely on those expectations.  FSA could have denied
23 their application in September 2000, or earlier, leaving the Renterias with no claim,
24 whatsoever, for damages.  In fact, their loan could have even been approved, but not
25 immediately funded, due to a lack of sufficient funds within the Agency.  7 U.S.C. §
26 1983a(4).  Pragmatically, the Renterias could not rely on the loan proceeds for their business
27 until the loan was in some way approved, as opposed to being denied or placed in pending
28 status due to lack of funds.  Since this approval did not occur until it was too late to plant

1 crops for the 2000 crop year, the Renterias reasonable reliance in the efforts made by the
2 FSA cannot be established. The Court finds that the Renterias have stated no claim for crop
3 year 2000.

### 2. CROP YEAR 2001

5 The Renterias complain that they suffered damages because the loan proceeds were
6 not timely distributed. They also allege that FSA did not advise them of a herbicide residue
7 that would likely lead to the failure of the planned chili crop. The late distribution of the loan
8 proceeds apparently caused the Renterias to incur $60,000 in labor costs to manually weed
9 the crop. (The offset for the cost of the unapplied herbicide is not indicated in the
10 Complaint.) Manual weeding did not affect the success of the crop. Rather, the herbicide
11 residue problem caused the loss of the entire crop.

12 As discussed above, the point when the loan is approved was the first time the
13 Renterias could reasonably rely on the efforts of FSA to distribute the loan timely. The facts
14 alleged in the Complaint do not sufficiently apprise the Court that the Renterias reasonably
15 relied on FSA's loan processing efforts. Nor do the facts indicate that the loan distribution
16 was indeed untimely. However, a claim for relief on the issue of the cost of manually
17 weeding the crop is stated.

18 With respect to the issue that the herbicide residue caused the chili crop to fail, while
19 sounding as a misrepresentation claim, can be legitimately stated as a claim for failing to use
20 reasonable efforts in processing the loan. The Renterias theorize that FSA negligently
21 approved their loans knowing that the chili crop would fail due to the herbicide residue. In
22 effect, the FSA approved a loan it knew could not be repaid. Defendant attempts to segregate
23 the misrepresentation element of these events from the loan processing elements:

> In this regard, defendant is incorrect that plaintiffs' claim is based on its agent's failure to disclose herbicide residue on plaintiffs' property. Regardless of whether or not defendant, through its agents, chose to disclose the presence of herbicide residue, and regardless of whether it had a duty to do so, defendant was negligent if it approved a loan knowing that it could not be repaid and thereafter instituted collection efforts against plaintiffs, causing them to file for bankruptcy. In other words, defendant's had a duty to follow basic lending practices in approving loans to individuals not able to repay them or

> where defendant knew, as is alleged here, that the collateral would likely be impaired. This duty is unrelated to the reason for the applicant's ineligibility for a loan, whether it be an unknown condition about the property or poor creditworthiness.

Defendant's Response, p. 7, fn. 3.

Given the pernicious practices of payday lenders and real estate speculators lending money to those in danger of mortgage defaults, the world might well be a better place if lenders had a duty to the borrower to determine the borrower's ability to repay the loan. No such duty exists. The lender's efforts to determine the creditworthiness and ability to repay by a borrower are for the lender's protection, not the borrower's. Here again, the missing element is reliance. The Renterias cannot establish any right to reasonably rely on FSA's determination of their ability to repay the loan. Rather, the Renterias had to rely on their own judgment and risk assessment to determine whether or not to accept the loan.

The Court finds that the claim that FSA negligently loaned money to the Renterias fails for lack of a duty. Therefore, the claims related to the failed 2001 crop year and the defaulted loans must be dismissed.

This determination does not negate the claim for the increased expenses for the manual weeding. Those increased expenses would still be a harm to the Plaintiffs regardless of whether the crop was ultimately successful.

### 3. CROP YEAR 2002

The Renterias argue that the loan default in 2001 caused them to be unable to obtain loans for the 2002 crop year. As discussed above, FSA had no duty to prevent the Renterias from entering into and ultimately defaulting on the 2001 crop year loans. As a result, the Renterias' inability to obtain loans for the 2002 crop year is not attributable to any breach of a duty by FSA. The Court finds that the claim for lost profits for the 2002 crop year must be dismissed.

Additionally, the Renterias' claim that they were unable to plant alfalfa on a leased farm in the Fall of 2002. The allegations of the Complaint, [¶¶ 40-46] indicate that the Renterias had been approved for AMTA payments to be used for planting alfalfa on Mr. Hardy's farm. The Renterias claim that FSA was negligent in contacting Mr. Hardy and in

1 communicating the need for a bankruptcy court order authorizing FSA to distribute the
2 AMTA payments.  Because these AMTA payments apparently had been approved, The
3 Renterias could rely on FSA to use reasonable efforts to timely distribute those funds.  The
4 Court finds that, this claim survives the Defendant's Motion To Dismiss.

5 Therefore, it is the Report and Recommendation of this Court that the District Judge,
6 after her independent review of the Record enter an order as follows:

7 1. GRANT Defendant's Motion To Dismiss [Dkt 9] in part and DENY in part.
8 2. That Plaintiffs' claim related to FSA's negligent failure to timely disburse funds to
9 allow herbicide treatment for the 2001 crop year and alfalfa seeding on the leased
10 farm in the 2002 crop year survives the Motion To Dismiss.
11 3. That all other claims are dismissed for failure to state a claim on which relief can be
12 granted.
13 4. That the caption is amended to designate the Defendant solely as the United States of
14 America.
15 5. A Scheduling Conference is set for **MONDAY, JULY 5, 2006, AT 1:30 P.M.**  The
16 conference will be conducted in Judge Pyle's Chambers [Chambers 5660].

17 Pursuant to 28 U.S.C. § 636(b), the parties have ten (10) days from the date of this
18 Report and Recommendation to file written objections to these findings and
19 recommendations with the District Court.  Any objections filed should be filed as CV 05-
20 00532-TUC-CKJ.

21 DATED this 15th day of May, 2006.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE

- 10 -